UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-CR-538 (DLF) |
| JACOB TRAVIS CLARK | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jacob Travis Clark to 46 months' incarceration, three years of supervised release, $2,000 in restitution, the mandatory $100 special assessment for each felony conviction, the mandatory $25 special assessment for each Class A misdemeanor, and the mandatory $10 special assessment for each Class B misdemeanor.

I.     INTRODUCTION

The defendant, Jacob Travis Clark, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United

1

Clark's criminal conduct on January 6 was captured in his text messages, surveillance videos of him entering and remaining in the Capitol building on January 6, and other evidence of his threatening behavior towards officers while inside the building. Clark knew Congress was certifying the Electoral College vote, he intended to stop the certification, he joined a violent mob that went inside the Capitol to achieve these goals, and he bragged about his actions to others.

Following a bench trial, this Court convicted Clark of:

- Obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2) (Count One);

- Entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two);

- Disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 § U.S.C. § 1752(a)(2) (Count Three);

- Engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Four);

- Disorderly or disruptive conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and

- Parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).

The government recommends that the Court sentence Clark to 46 months' incarceration, which is within the advisory Guidelines' range of 41-51 months, which the government submits is the correct Guidelines calculation. A 46-month sentence reflects the gravity of Clark's conduct and his personal history and characteristics.

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

## II.        FACTUAL BACKGROUND

### A.        The January 6, 2021 Attack on the Capitol

The government refers the court to ¶¶ 1-7 of the stipulated Statement of Offense filed in this case, ECF No. 43, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.        Clark's Role in the January 6, 2021 Attack on the Capitol

#### *Clark's Messages Leading Up to January 6*

Clark anticipated violence well before January 6. He sent text messages to various persons discussing his plans to attend the former President's January 6 rally. ECF No. 43 at ¶ 9. In one of those, he stated that going to Washington D.C. on January 6, 2021, was "maybe the start of something." *Id*. He anticipated January 6 to be a "revolt." *Id.* According to Clark, "they are going into DC and bringing guns. Which isn't allowed in DC. They aren't gonna let Biden win." *Id.* Clark made his intention clear that he wanted to go to Washington D.C. on January 6 and "be a part of history." *Id.* He also messaged a friend indicating he wanted to put "tar and feathers" on politicians on January 6. *Id.*

#### *Clark Attends the Rally*

On January 5, 2021, Clark drove from his home in Colorado to Washington, D.C. On January 6, 2021, Clark attended former President Trump's rally. He hoped for the election to be stopped that day and texted his father throughout his time at the rally that morning. ECF 43 at ¶ 11. Again, he anticipated violence, as he texted his father, "It's a trump thing I'm here for the riots

when they say he isn't the winner lol." *Id.*

### Clark Unlawfully Enters The U.S. Capitol

After the rally, Clark walked to the West Front of the U.S. Capitol grounds. ECF No. 43 at ¶ 12. Clark, along with the mob he was with, forced their way through the barricades on the West Front. *Id.* at ¶ 13. While Clark was on the grounds was there, he continued to text his friends, "we are gonna storm the capital." *Id.* at ¶ 12. At approximately 2:14 p.m., Clark entered the U.S. Capitol building through the Senate Wing Doors, among the first to do so. *Id.* at ¶ 14. *See* Image 1.



*Image 1 – Clark Enters the U.S. Capitol through the Senate Wing Doors*[2]

While Clark was inside the Capitol, he went onto the second floor, onto the third floor, inside the Rotunda, walked through multiple hallways, and even admitted to being of the first rioters that entered the Senate Gallery. ECF No. 43 at ¶¶ 14-19. While inside the Capitol, Clark continued to send text messages to others stating "yeah I'm in the capitol (sic) building" and "we stormed it and busted the door down." *Id.* at ¶ 14.

### Clark Threatens Police Officers Inside the U.S. Capitol

---

[2] This is a still image from Exhibit 1 at 2:14:47 p.m. The government shared its exhibits with the Court and the defendant via USAfx.

While Clark was inside the Capitol, he traveled towards the Crypt where he and other rioters encountered a line of police officers who attempted to stop the group from proceeding deeper into the building. At approximately 2:17 p.m., Clark threw an object towards a line of officers inside the Crypt. *See* Image 2. Minutes before this, officers retreated into the Crypt and formed a line to prevent rioters from gaining further access to the Capitol building.



*Image 2: Clark Throws Object at Officers Inside the Crypt*[3]

Between approximately 2:19 p.m to approximately 2:30 p.m., Clark joined a crowd of rioters, pointed at police and threatened them. ECF No. 43 at ¶ 15. Due to his actions, along with the mob he was with, the police officers were forced to retreat, and Clark proceeded deeper into

---

[3] This image is a still image from Exhibit 2 at approximately 11 minutes and 10 seconds.

the Capitol building towards the second floor of the Capitol and into the Rotunda. *Id.*



*Image 3 – Clark Pointing and Yelling at Police Officers at approximately 2:30 p.m.*[4]

Clark did not stop there. At approximately 2:38 p.m. Clark exited the Rotunda and joined a crowd of rioters gathered at the second-floor door that exits to the east side of the Capitol grounds.. Clark joined other rioters who used the size of their mob to push against officers who are protecting the door. After rioters opened the doors and gained entry to the building, Clark signaled the rioters behind him to move forward with him into the Capitol. *See* Image 4. Due to the actions of Clark and the other rioters, the officers were forced to retreat, allowing the breach. Clark's participation in this enabled other rioters to enter the Capitol. ECF No. 43 at 10. *See also*

---

[4] This image is a still image from Exhibit 3 at approximately 12 minutes and 5 seconds.

Images 4-6.



*Image 4: Clark Signaling Rioters to Go Forward*[5]



*Image 5 - Clark at the Second-Floor Door at approximately 2:38 p.m. (circled in red)*[6]

---

[5] This still image is from Exhibit 4 at approximately 2 minutes and 59 seconds.
[6] This still image is from Exhibit 4 at approximately 2 minutes and 40 seconds.



*Image 6 - Clark at the Second-Floor Door*

At approximately 2:41 p.m., U.S. Capitol Police Officers attempted to close and lock the Senate Gallery doors. While they did so, Clark, along with a group of rioters confronted the officers. Although Clark made no contact with the officers, he was a part of the mob that pushed and hit officers who were forced to retreat before one of the doors could be locked. *Id.* at ¶ 12.



*Image 7 - Clark and Group Confront Officers at the Senate Gallery Doors at approximately 2:41 p.m.*

As the officers retreated from this area, the crowd followed. ECF No. 43 at ¶ 18. Clark

approached one of the officers and squared up into a fighter's stance. *Id*. *See* Image 8 No fight

occurred, however, Clark was able to gain access to the Senate Gallery. *Id*. at ¶ 19. *See* Image 9.



*Image 8 - Clark takes a fighting stance against a police officer[7]*



*Image 9 - Clark Inside the Senate Gallery*

*Clark Leaves the U.S. Capitol Building*

At approximately 3:53 p.m., Clark left the Capitol through the Senate Carriage door after

---

[7] This still image is from Exhibit 5 at approximately 8 minutes and 22 seconds.

spending nearly 40 minutes inside the Capitol building. ECF No. 43 at ¶ 21. After he left the Capitol building, Clark continued to brag to others via text messages about his unlawful escapade, sending pictures and saying, "I helped break down the door," "I was the first one in the chamber," "We took the whole thing. They had to evacuate." *Id.* at ¶ 20. Clark knew his actions caused the Electoral College vote to not take place. And he intended on continuing his escapade as evident by his message to a friend saying, "We do it everyday they try to vote." *Id.*



*Image 10 - Clark Exits the U.S. Capitol at 2:53 p.m.*

### III.  THE CHARGES

On August 25, 2021, a federal grand jury returned a superseding indictment charging Clark with the six counts identified above. As noted above, following a stipulated trial on, January 30, 2023, this Court convicted Clark of each of those charges.

### IV.  STATUTORY PENALTIES

Clark now faces sentencing on all Counts of the Indictment. On Count One, Clark faces up to 20 years' imprisonment, three years of supervised release, five years of probation, a fine up

to $250,000, a special assessment of $100 and $2000 in restitution. On Counts Two, Three, and Four, Clark faces up to one year of imprisonment, one year of supervised release, five years of probation, a special assessment of $25, and $2000 in restitution. On Counts Five and Six, Clark faces up to six months' imprisonment, five years of probation, a special assessment of $10 and $2000 in restitution.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government's Guidelines calculation is set forth below.[8]

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening Physical Injury to Person or Damage to Property[9] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[10] | |

---

[8] Where the PSR determines that multiple offenses group (such as Counts One, Two, and Three), it does not perform a Guidelines analysis for each count.  However, under Sections 1B.1.1(a)(1)-(3) of the Guidelines, the Court must, for each count, determine the applicable Guideline, determine the base offense level, apply appropriate special offense characteristics, and apply any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

[9] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice." Specifically, when Clark took a fighting stance against a police officer outside the Senate Gallery, he threatened physical injury to that officer.

[10] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Clark admitted that he corruptly

<u>+3</u>

|  |  | **Total** | **25** |
|---|---|---|---|

Count Two: 18 U.S.C. 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(c)(1) | *Cross Reference to U.S.S.G. § 2X1.1* | |
| U.S.S.G. § 2X1.1(a)[11] | Apply base offense level and adjustments for intended felony (18 U.S.C. § 1512) | 25 |

|  |  | **Total** | **25** |
|---|---|---|---|

Count Three: 18 U.S.C. 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 3A1.2(a), (b) | | |

|  |  | **Total** | **10** |
|---|---|---|---|

Count Four: 18 U.S.C. 1752(a)(4)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 3A1.2(a), (b) | | |

|  |  | **Total** | **10** |
|---|---|---|---|

Count Five and Six: 40 U.S.C. 5104(e)(2)(D) and (G)

Counts Four and Five are Class B misdemeanors to which the Sentencing Guidelines do not apply.

| **Combined Offense Level** | **25** |
|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **22** |

---

obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[11] U.S.S.G. §2X1.1(a) states that the proper calculation should consist of "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." The substantive offense/intended felony here is Count One: 18 U.S.C. § 231(a)(3).

The Probation Office determined that, because he elected a stipulated bench trial, he was entitled to a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a). PSR ¶ 28. When the draft presentence report was issued, the government had not yet determined whether it would move for an additional one-level downward adjustment under § 3E1.1(b). *Id.* The government has determined that it will move for that third point, so Clark is entitled to a three-level downward adjustment for acceptance of responsibility.

Under U.S.S.G. § 3D1.2(a) and (c), "closely related counts" group. Counts 1 through 3 group because they all involve the same victim, Congress. The victim of Count 4—a violation of 18 U.S.C. § 1752(a)(4)—is the police officer(s) who were threatened with physical violence in a restricted building or grounds. Because that offense encompasses conduct that serves a specific offense characteristic of another count—here, the eight-level enhancement under U.S.S.G. 2J1.2(b)(1)(B) for the Count 1 obstruction offense—Count 4 groups with Counts 1-3. *See* U.S.S.G. § 3D1.2(c). The offense level for the group is the offense level for the count with the highest offense level, here, Count 1, which is 22. The combined offense level is therefore 22. *See* U.S.S.G. § 3D1.3(a).

The Probation Office calculated Clark's criminal history score as one, and criminal history category as I. PSR ¶ 56. The government does not dispute that determination. With a combined offense level of 22 and a criminal history category of I, the advisory imprisonment range is 41 to 51 months.  U.S.S.G., Ch. Five, Pt. A, Sentencing Table.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Clark's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Clark texted others that he was willing to riot on January 6 to stop the certification of the electoral college vote. Clark then traveled to Washington D.C. to make good on his messages sent to others. While he was in D.C., Clark entered the Capitol building, went inside sensitive areas of the building, threatened officers, threw an object at officers, and bragged about his actions to his friends. The nature and circumstances of Clark's offense[s] were of the utmost seriousness, and fully support the government's recommended sentence of 46 months' incarceration.

### B.  Clark's History and Characteristics

Although Clark's criminal history category is I, the PSR states that he has had numerous interactions with the criminal justice system.

- In 2006, Clark pled *nolo contender* to possession of a controlled substance. Clark was sentenced to six months of probation. PSR ¶ 52.

- In 2010, Clark was charged with and pleaded guilty to criminal impersonation and driving under the influence. He was sentenced to three years deferred probation for the criminal impersonation conviction. He was sentenced to 15 days' imprisonment and 3 years' probation for the driving under the influence conviction, concurrent with the criminal impersonation sentence. PSR ¶ 54.

- In 2015, Clark was charged and found guilty of causing an open fire. He was assessed a fine of $285.50. PSR ¶ 55.

14

- Clark also has ten traffic infractions dating from 2009 to 2019. PSR ¶¶ 57-67.

Clark's  crimes on January 6 were not an isolated event in an otherwise law-abiding life. While his criminal history category is I, Clark is different from the individuals who committed crimes on January 6, 2021, even though they had no prior contacts with the criminal justice system.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Clark's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Clark's social media statements after he left the Capitol were those of a man who wanted to repeat his criminal behavior. After rioting in the Capitol building on January 6, he told another

---

[12] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

person that "we do it everyday they try to vote." ECF 43 at 13. And in response to "how is everything going to get passed then?" Clark responded saying, "Its not till we get what we want." ECF 43 at 14. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble.") (statement of Judge Chutkan). When Clark went inside the Capitol he participated in the mob that pushed officers and forced these officers to retreat. He also threw an object at a line of officers, threatened officers and stood in a fighting stance against an officer. Clark's own statements afterwards that he would "do it everyday they try to vote" demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes, particularly in light of his history of criminal behavior and violent rhetoric.

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

17

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[14]

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[14] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Neefe*, 21-cr-567 (RCL), the defendant pled guilty to violating 18 U.S.C. §1512(c)(2) and other misdemeanor charges. Like Clark, Neefe planned for conflict in advance of January 6 and made a number of posts on social media indicating that he intended to  stop the certification of the electoral college vote. Like Clark, Neefe went inside the Capitol, disregarded police officers' commands to leave and stayed in the Capitol for over 40 minutes. Like Clark, Neefe bragged about what he did after he left the Capitol in social media messages to his friends and that he would go back inside. Judge Lamberth sentenced Neefe to 41 months' incarceration.

In *United States v. Rubenacker*, 21-cr-193 (BAH), the defendant pled guilty to violating 18 U.S.C. §1512(c)(2), two other felonies, and other misdemeanor charges. Like Clark, Rubenacker knew there was going to be a violent conflict on January 6 and made a number of inflammatory posts on social media. Like Clark, Rubenacker entered the Capitol and threatened police officers. Like Clark, Rubenacker joined a  mob to force officers to retreat and then gained access to different areas of the Capitol. Judge Howell sentenced Rubenacker to 41 months' incarceration.

In *United States v. Reid*, 21-cr-316 (DLF), the defendant was convicted of violating 18 U.S.C. §1512(c)(2) and other misdemeanor charges. Like Clark, Reid anticipated violence and made many statements leading up to and even after January 6. Like Clark, Reid also actively

participated in the riot and witnessed violence. However, Clark conduct was more egregious than Reid's. Clark made threats against officers and stood in fighting stance against an officer while in the building. Unlike Reid, Clark also threw an object at officers. This Court sentenced Reid to 37 months' incarceration for his actions. Clark's actions here are more violent, considering the threats he made to officers inside the building and "squaring up" fighter stance he took against police trying to protect the Capitol.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[15]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each

---

[15] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Clark to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Clark's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months' incarceration (the mid-point of the sentencing guidelines range), three years of supervised release, $2,000 in restitution, the mandatory $100 special assessment for each felony conviction, the mandatory $25 special assessment for each Class A misdemeanor, and the mandatory $10 special assessment for each Class B misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____
NIALAH S. FERRER
Assistant United States Attorney
New York Bar No. 5748462
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov

23