**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 1:21-cr-00538-DLF** |
| | : | |
| **JACOB TRAVIS CLARK,** | : | |
| | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM**

Jacob Clark respectfully requests that this Honorable Court sentence him to a period of nine months of incarceration.

In many respects, the defendants charged in January 6th cases have had very different life experiences than the D.C. defendants that typically come before this Court.   And some judges have observed that many of these defendants have been afforded considerable "privilege" in their lives and upbringing.   Jacob Clark is different. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

      ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

With all that has happened in his background, it is surprising that Mr. Clark is an exceptional

parent with a functional job and a minimal criminal record.

      Why does this matter in this case?  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

      It has been two and a half years since January 6th and more has happened since then.   In

August 2021, his wife and daughter moved to Laramie, Wyoming.   But while they were there,

his wife's significant mental illness began to manifest in unpredictable ways.   His wife moved

back to Colorado, leaving Mr. Clark to care for their 14 year old daughter alone.   This period has

been a blessing.   Between the stress and remorse from his actions on January 6th, the guilt that he feels because of the impact his absence will have on his daughter and his renewed determination for the daughter he adores, Mr. Clark has become refocused in his life.   He has grown into his role as single father and has worked several jobs in order to save money for her while he is incarcerated.   He has also become reflective about his actions and how their impact on his daughter.   He regretted his actions by January 7th – as demonstrated by his statements to his counsel and to his father.   He expressed to counsel shortly after his arrest that he wanted to accept responsibility for his actions.   For all of these reasons, the defense recommends a sentence of nine months of incarceration in addition to a period of supervised release.   Mr. Clark requests a recommendation of mental health and substance abuse treatment.

<center>**Argument**</center>

**I.      The Appropriate Guideline Range for Mr. Clark is 15-21 months.**

The Probation Office incorrectly assesses Mr. Clark's guideline range.   First, the probation office improperly withheld the third point for acceptance of responsibility.   PSR ¶ 50.   Second, the probation office added an eight-level enhancement under U.S.S.G. §2J1.2(b)(1)(B) without a factual basis.   Mr. Clark is properly under Offense Level 14 and Criminal History Category I and thus his proper guideline range is 15-21 months.

**A. Mr. Clark should be given a third point for acceptance of responsibility under U.S.S.G. §3E1.1(b).**

The Probation Office determined that Mr. Clark should not receive a third point for acceptance of responsibility, even though he informed the government early on that he did not intend to contest the facts at trial.   Mr. Clark's "trial" lasted less than one hour.   The government knew well in advance that it would not have to prepare for trial.   No motions in limine were filed.

<center>3</center>

He should thus be assessed the third point.

**B. Mr. Clark should not be assessed with an 8-level enhancement because his offense did not involve causing or threatening to cause physical injury to a person or property damage, in order to obstruct the administration of justice.**

    **i. The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristics.[1]**

The PSR added eleven levels to Mr. Clark's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b). For the reasons set forth in the Honorable Judge McFadden's opinion on this issue[2], the application of these enhancements is a legal error and factual error.

The relevant specific offense characteristics provide as follows:

If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

The guidelines application note states that "substantial interference with the administration of justice" includes:

---

[1] Undersigned counsel is aware that this Court applied the administration of justice enhancements in *United States v. Reffitt*, 1:21CR32 (DLF). Undersigned counsel's review of the dockets reveals that the issue was not fully briefed before this Court. In any event, counsel respectfully objects to the application of the enhancement based on the facts of Mr. Clark's case, the plain text of 2J1.2(b), the guidelines commentary, and judicial interpretation of the enhancement.

[2] Rather than summarizing Judge McFadden's reasoning, undersigned counsel has attached Judge McFadden's Order as Exhibit 4 and incorporates it by reference.

a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding"). Moreover, as noted by Judge Berman Jackson in *United States v. Joshua Black,* 21-cr-127 (ABJ), the application notes set forth examples only involving judicial

5

proceedings or an interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines. Under the law-of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

The Sentencing Commission did not include the words "official proceeding" in Section 2J1.1 because it did not intend to.   The government cannot read words into the guidelines that the Commission did not include, especially where doing so results in an 11-level increase in the guideline range, which translates into *years* of a defendant's liberty.

Finally, it would be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18. It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. It is that §2J1.2 was designed to sentence offenses under § 1503. U.S.S.G. §2J1.2 cmt Statutory Provisions. Section 1503 contains the exact same phrase, "administration of justice."

    ii.    **§2J1.2(b)(1)(B) does not apply factually.**

The PSR does not articulate its factual basis for assessing the 8-level increase against Mr. Clark. Mr. Clark did not assault anyone or destroy any property.    He did not threaten anyone.

While Mr. Clark regrets his conduct by entering the building and for his actions within the building, he neither "caus[ed] [n]or threaten[ed] to cause physical injury to a person, or property

6

damage."   He may have been in proximity to other individuals with different designs but Mr. Clark never hit or threatened anything or anyone.   Moreover, there is no evidence that he did so "in order to interfere with the administration of justice" as required by the Guidelines. His actions were reactive and, while he may have been taunting officials and may have even joined in loud requests to "stand down" he never touched anyone or anything or threatened to physical injury or property damage.

### iii.   The "substantial interference" under 2J1.2(b)(2) specific offense characteristic does not apply.

The government appears to be seeking this offense characteristic in every § 1512(c)(2) case without regard to factual differences. The common thread linking the examples of "substantial interference" with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. Here, Mr. Clark's actions had no causal relationship with the outcome or duration of the joint session. He assaulted no one and he did not encounter legislators or staff. He did not enter the Senate Chamber until after the Senate had recessed and he left after a few moments.   In that sense, his conduct was largely similar to that of Class A and B misdemeanants who entered the building and engaged in disorderly conduct. There is no factual basis for calling Mr. Clark's conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.

## II.   Application of the Sentencing Factors

## A. Mr. Clark's history and characteristics demonstrate that a nine-month sentence is appropriate.

*"I feel terrible.   I ruined my life and I probably ruined my daughter's life.   I regret it every day.   I probably won't even get to see my daughter graduate..   I messed up.   I really failed.   I can't blame anyone else and I won't try to.   I just want to say sorry."*

*Jacob Clark on January 30, 2023.*

Mr. Clark is a hard-working man singularly dedicated to supporting his 14 year-old daughter.   He has been working additional jobs to save money for his daughter during his anticipated incarceration.   He currently works as a laborer for a construction and logging company.   His ability to earn money is largely seasonal, and as a resident of the Mountain West, he relies upon other seasonal work to make ends meet.   For example, he has worked supplemental jobs in snow removal, landscaping and work on farms.

Mr. Clark has a minimal criminal record that results in one criminal history point.   The criminal history that he does have relates to his past poverty.   His offenses are primarily relating to driving.   His one conviction for "Criminal Impersonation" stems from a time where his license was suspended and he was unable to work.   Faced with an impossible dilemma, he made the poor choice of driving without a license and then produced another person's license when he was pulled over. He pleaded guilty and received probation.

By all accounts, Mr. Clark is a loving father who is focused only on trying to make his daughter's childhood the opposite of his own.   It has been a struggle.   His "one true love," his wife, suffers from mental illness and has difficulty maintaining a residence.   She is wholly incapable of raising their 14 year old daughter on her own and is also unable to coparent in a meaningful way.   He has forgiven his father and maintains a relatively close relationship with him.   But Mr. Clark's life can only fairly be described as a struggle.

8

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Mr. Clark is not a particular political person and did not vote in the presidential election.

However, he was unhappy with the government's response to the pandemic and wanted to

9

express himself.   With his mental state at the time, he was easily caught up in the anger and emotion of the day and acknowledges that he bore a general anger towards the authority figures who, in his view, never made any effort to protect him from his abysmal childhood.



All of these factors culminated into Mr. Clark's decision to go to Washington D.C. on January 6th.   He does not sugarcoat his mindset from January 2021. While he did not go knowing that he would enter the Capitol and interfere with the election certification process, he did go in anticipation of something happening.   He frankly reports that he is not surprised that he became involved in what he candidly describes as a "riot."

Mr. Clark thought that his actions that day were going to "change the system."



[redacted]

**B. The nature and circumstances of Mr. Clark's offense do not warrant a significant prison sentence.**

Mr. Clark was part of one of the worst moments of American history when he entered into the Capitol.   However, he did not plan for violence and did not engage in violence after arriving. He had no weapons or body armor when he came to the District.   He did not use social media to publicly brag about his actions.   He did not attempt to destroy evidence.   Although he acknowledges that he yelled, chanted and had verbal confrontations with police, he did not assault any officers or property and did not threaten anyone.

**C. A long Period of incarceration is not appropriate for Mr. Clark**

A significant sentence of incarceration is not appropriate for Mr. Clark. To begin, Mr. Clark's own self-view is that he deserves whatever prison time he gets. ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

Following his sentence, Mr. Clark will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same

12

sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019)

("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of

supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a

non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment,

not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006)

("[R]estitution is […] part of the criminal defendant's sentence.").

Moreover, the Court should consider the severe collateral consequences that attach to Mr.

Clark in assessing whether the sentence meets the directives of 3553(a) to impose a sentence that

constitutes a just punishment and constitutes adequate deterrence.    Mr. Clark's arrest was

widely published in his local news and Mr. Clark struggled to find good work in Colorado.   He

has since moved to Wyoming and lives there with his daughter but his wife has returned to

Colorado and has moved on with her life.

The other collateral consequences that attend to Mr. Clark's felony conviction are

substantial. District judges have recognized the life-long, damaging impact of a felony

conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable

Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail
> sentence, and it's just not true. People can suffer in many different ways and do
> suffer in many different ways a result of their conduct and that is something every
> judge, at least on this court, I believe, understands, and takes into account when
> they're fashioning the appropriate sentence.[3]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the

---

[3]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 *(*internal quotations, alterations, and citations omitted*)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs.

Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

14

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[4]  In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Clark or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

---

[4]  Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

**D.  A sentence of time-served avoids unwarranted disparities.**

Mr. Clark did not assault or injure anyone. While he recognizes that his actions in general that day were reckless, he drew an important line that he did not cross.   A prison sentence that will remove Mr. Clark from his daughter and the community and lock him away for years is not warranted and will create vast disparity with other cases involving similar conduct.

██████████████████████████████████████████████

███████████████████████████   These factors have not been presented in many other cases.   However, it is helpful to consider *United States v. Matthew Wood*, 21-cr-223 (APM), where Judge Mehta sentenced the defendant to probation.

Mr. Wood pleaded guilty to all charges in the Indictment of which the lead charge was 18 U.S.C. § 1512(c)(1). Like Mr. Clark, the PSR applied the 8 and 3-level enhancements under U.S.S.G. §2J1.2(b)(1)(B) and §(b)(2), respectively. Gov. Sentencing Memo, ECF. No. 55 at 47. The government requested a sentence of 57 months based on its guidelines calculation of 51 to 63 months.

Judge Mehta declined to apply the eight-level enhancement under Section 2J1.2(b)(2) despite evidence that Wood boasted about fighting police and "storming" the Capitol in messages to others such as: "We sent congress running into their escape tunnels," and "We just stormed the Capitol, we are busting into house chambers," "We busted the windows out." Wood falsely told a friend, "I am fighting capitol police." According to the government, Wood was also part of a group that "terrorized" staffers present in House Speaker's suite of offices."[5] Judge

---

[5] ECF. No. 55 at 51.

16

Mehta did apply the 2-level enhancement for obstruction. Ultimately, Judge Mehta imposed a sentence of one year of home detention.

Mr. Wood's conduct is similar to how the government characterizes Mr. Clark's conduct and the sentence imposed on Mr. Wood supports Mr. Clark's request. Indeed, the government sentencing memos in both Mr. Wood and Mr. Clark's case contain similar hyperbole and at times portray the men as dangerous seditionists rather than what they truly were: vulnerable individuals in deep distress—and for Mr. Clark, ███████████████████████ ████████  It is beyond dispute that vulnerable individuals like Mr. Clark had been fed lies by the President of the United States (and other powerful people) arguing that democracy was at stake, that their vote had been stolen, and that it was up to them to stand up for the "true President."[6] Some similarities between Mr. Wood and Mr. Clark's admitted conduct are:

- Prior to January 6, Mr. Wood, like Mr. Clark, made blustering comments about January 6. Specifically, Mr. Wood messaged comments such as January 6 "is going to be wild" and that he was "down for whatever they want to do!" He also boasted that he was prepared to "raid Congress" and "be brave heart in that bitch."[7]

- Mr. Wood climbed the media tower and "encouraged others forward." According to the government, he incited others to violence.[8]

---

[6] According to Representative Liz Cheney, Vice Chair of the House Select Committee investigating January 6, "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committeehearing-transcript.

[7] Id. at 1-3.

[8] ECF. No. 55 at 3.

- Mr. Wood entered through a broken window.[9]  Unlike Mr. Clark, however, he pursued police officers, including Officer Eugene Goodman upstairs to the Ohio Clock corridor.

- Like Mr. Clark, Mr. Wood went from the Ohio Clock corridor to the a Chamber of Congress and similarly told others that he and "just broke through Capitol police" (among other blustery comments).

- According to the government, Mr. Wood pushed against police officers; Mr. Clark did not make physical contact with officers.

- Wood was in the Capitol for a total of 80 minutes.[10]  Mr. Clark was inside for less than half that time.

- Mr. Wood deleted his Facebook account after January 6 and urged an individual whom he has messaged to delete their conversation.

- Mr. Wood climbed scaffolding and waived his arms and yelled.   He encouraged protestors forward.[11]

- Mr. Wood entered the Speaker's suite and took video of his antics there, including taking a drink of water from a glass sitting on a table. According to the government, he was part of a group that "terrorized" the staffers in the Speaker's suite.[12] Video captures Wood yelling, "Madam Speaker, we want to have a word with you!" and "Here's Johnny!." Mr. Clark did not enter the Speaker's suite or any private areas of Congresspersons.

---

[9] Id. at 4
[10] Id. at 4
[11] Id. at 22
[12] Id. at 28

18

- Mr. Wood made his way to the Rotunda, where police officers began forcing people to leave. He refused to leave and instead assisted other protestors pushing against police.[13]

- After January 6, Mr. Wood uploaded his pictures to social media with messages such as "We sent those politicians running."[14]   Mr. Clark did not post on social media.

- Like Mr. Clark, Mr. Wood wore regular "street" clothing—no combat or military gear. Like Mr. Clark, Mr. Wood did not bring weapons, though he boasted of using "guns" in his messages.

For this conduct, the government requested a sentence of 57 months for Mr. Wood. After declining to impose the 8-level enhancement, Judge Mehta imposed no prison time.

1.   Similarly situated January 6 cases

While the Justice Department unquestionably treats January 6 defendants harsher than any other category of defendants arrested in connection with aggressive, disruptive political protests,[15] even when compared to sentences imposed in January 6 cases, it is apparent that a sentence of some, but not significant, incarceration is appropriate for Mr. Clark. For example, in a recently concluded case in which the defendant was convicted of physically striking a police

---

[13] Id. at 38.

[14] Id. at 55.

[15] Indeed, protestors who flooded into the Senate Atrium to protest Justice Kavanaugh's confirmation hearings after U.S. Capitol Police barricaded the front of Capitol were charged with misdemeanors, the vast majority of which were resolved by deferred prosecution agreement and nominal fines in Superior Court. Certainly, the Justice Department declined to wield the federal felony obstruction of justice statute against *those* protestors, though their conduct seemed inarguably designed to, and did, disrupt an official proceeding. *See* Jason Breslow, *The Resistance at the Kavanaugh Hearings: More than 200 arrests*, NATIONAL PUBLIC RADIO, September 8, 2018 (reporting that most of the over 200 Kavanaugh demonstrators arrested were charged with disorderly conduct or crowding and ordered to pay fines of $35 or $50).

officer on January 6, *United States v. Sargent*, the Honorable Thomas Hogan imposed a sentence of 14 months. In addition to hitting an officer with his hand, that defendant recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[16] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor.   At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us."[17] By contrast, Mr. Clark did not strike, much less injure any police officer. These factors militate in favor of a sentence below that imposed on defendant Sargent.

In another January 6 assault on-a-federal-officers case, the Honorable Amy Berman Jackson imposed a 6-month sentence on a 57-year-old veteran who chanted at officers standing before him to "join us." When two officers tried to repel Mr. Leffingwell and the crowd around him, he struck both officers in the head.[18] Despite his physical assault of two officers, Judge Berman Jackson imposed a sentence of six months. In another case involving assaultive conduct, the Honorable Paul Friedman imposed a sentence of five months on January 6 defendant who, while carrying a large Confederate flag and a backpack with a knife and duct tape in, pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands.[19] Again, these cases demonstrates that a sentence of 9 months days followed by supervised release is appropriate for Mr. Clark, who did not strike or injure any officers.

---

[16] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.

[17] *Id.*

[18] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.

[19] *United States v. David Blair*, 1:21CR186 (PLD), ECF. No. 55.

III.    **A downward departure is otherwise appropriate**

The Court should depart from the sentencing guideline range to a sentence of probation

pursuant to USSG §5H1.3.   ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Certainly, his conditions present an "unusual degree and distinguish the case from the typical

cases covered by the guideline."   U.S.S.G. §5H1.3.

## Conclusion

Mr. Clark thus respectfully requests that this Court sentence him to a period of nine months

incarceration and a period of supervised release, with conditions to include mental health and

substance abuse treatment.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____ _____
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Eugene_ohm@fd.org

21