UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Case No. 21-cr-538 (DLF) |
| | : | |
| **JACOB TRAVIS CLARK** | : | |

**DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY**

Mr. Jacob Travis Clark, through undersigned counsel, respectfully moves this Court to suppress the use as evidence all testimony relating to the identification of Mr. Clark made by U.S. Capitol Police Officer Cameron Sikurinec. Counsel requests a hearing on this Motion. In support of this Motion, counsel submits the following:

**Factual Background**

Mr. Clark is charged with numerous counts related to his alleged conduct on January 6, 2021, including one count of civil disorder under 18 U.S.C. § 231(a)(3) and two counts of assaulting, resisting, or impeding certain officers using a dangerous weapon under 18 U.S.C. § 111(a)(1) & (b). As relevant here, the government alleges that Mr. Clark used a wooden plank to assault and inflict bodily injury on Officer Sikurinec.

On January 22, 2021, Officer Sikurinec reported that during the events of January 6, he was struck by a 2x4 wooden plank. He and his fellow officers had encountered a group of individuals who had entered the Capitol near the Crypt area of the building. According to Officer Sikurinec, before he was hit, he was "in the front of the officers" and the crowd was coming towards them when one of those individuals ran and lobbed a wooden plank at him and his fellow

1

officers. The plank struck him in the groin, and he moved back in the line of officers. At that point, the crowd advanced until it made contact with the officers.

On September 1, 2021, an FBI agent assigned to the case sent Officer Sikurinec an email with photographs of three January 6 suspects holding 2x4 planks.[1] The agent appears not to have considered or used any of the proper procedures for composing a photo array—e.g., asking for a description of the suspect, creating a photo array with images of the suspect and similar looking innocent individuals ("filler photos"), etc. On September 7, 2021, Officer Sikurinec, in a follow-up interview a week later, apparently identified the photograph of Mr. Clark holding the plank as the person who had struck him. It is unclear, from discovery thus far provided, whether the FBI agent used any of the established procedures for administering a photo array—e.g., using double blind procedures.

**Argument**

A pre-trial or in-court identification by an individual following a review of a photographic array must be suppressed where the array gives rise to a "very substantial likelihood of irreparable misidentification" in violation of the Due Process Clause. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977); *Simmons v. United States*, 390 U.S. 377, 384 (1968). In determining whether an identification should be suppressed, a court first considers whether the photographic array was unnecessarily suggestive. If the identification procedure was indeed unduly suggestive, the inquiry proceeds to the second step: reliability. A court examines indicia of reliability such as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of

---

[1] Defense counsel have requested additional discovery related to this photo array, communications with the officer, and the government's internal procedures for array composition and administration. Defense counsel reserve the right to supplement their legal arguments based on that information and any information that arises from an evidentiary hearing.

attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). Suggestiveness alone "does not violate due process so long as the identification possesses sufficient aspects of reliability." *Id.* at 106. However, if the indicia of reliability do not outweigh "the corrupting effect of the suggestive evidence," a court must suppress the identification. *Id.* at 114.

I. **The identification of Mr. Clark must be suppressed because it was impermissibly suggestive and lacked any indicia of reliability.**

   a. **The identification procedure was unduly suggestive.**

Factors courts consider in evaluating the suggestiveness of a procedure include the "size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Cooper*, 85 F. Supp. 2d 1, 36 (D.D.C. 2000) (quoting *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992)). Here, each of these factors weigh in Mr. Clark's favor and mandates the conclusion that the photographic arrays were impermissibly suggestive.

First, the array presented here is small. Courts have declined to prescribe a constitutional minimum for the number of photos presented in an array, opting instead to hold that the size of the array exaggerates or diminishes other irregularities.[2] Courts have broadly recognized that "on the whole, minor irregularities will be less noticeable and prejudicial as the number of photographs increases." *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994). "A relatively small number of photographs in an array," by contrast, "heightens the need to examine the suggestivity of irregularities between the subjects in the array." *United States v. Rattler*, 475 F.3d 408, 413 (D.C. Cir. 2007). As the Tenth Circuit has explained, "a photo array with only six photographs"

---

[2] The D.C. Metropolitan Police Department, for example, uses nine photographs.

3

is "a number sufficiently small to weigh heavily in the balance of the factors to be considered," and significantly accentuates the effects of other irregularities on the viewer. *Sanchez*, 24 F.3d at 1263; *see also United States v. Worku*, 800 F.3d 1195, 1203 (10th Cir. 2015) ("In six-photograph arrays, significant weight is given to irregularities."). Here the array contained only three photographs, therefore the need to examine the suggestively of any irregularities is heightened.

Second, the FBI agent does not appear to have used the proper procedures for a photo array. Generally, a photo array is conducted via an in-person interview where the person is provided a selection of photographs by a neutral law enforcement officer who is not investigating the case and does not know which photograph is of the suspect. This is called a "double-blind" photo administration. Here, Officer Sikurinec appears to have been provided the photographs via email, not in person. He was not presented with the photos in any structured manner but rather had custody of them for over a week. To make matters worse, the investigating agent appears to have been the person who both provided the photographs to Officer Sikurinec and took the eventual identification. Social science research clearly establishes the importance of a double-blind procedure in minimizing the suggestiveness of a photo array. "Without the double-blind procedure, there is an avoidable risk that the administering officer will inadvertently provide cues to the witness before, during, or after the viewing." *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015).

Third, the photo array—such that it can even be called that—appears to comply with none of the proper procedures. Ordinarily, as noted earlier, a photo array is composed of a single suspect photo and several photos of people know not to have committed the crime, known as "fillers." The filler photos are supposed to line up with the description of the suspect given by the witness. Here,

the photos in the array were all of people present on January 6, 2021 who had been seen holding 2x4s. In other words, they were all suspects, no fillers.

To make matters worse, the photos used were not normal array photos—generally front facing photos of a person's face against a neutral backdrop. Instead, they were surveillance photos from January 6 itself of the suspects holding 2x4 planks. This choice was highly suggestive. The "chance of misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons [presented] committed the crime." *Simmons v. United States*, 390 U.S. 377, 383 (1968) (emphasis added; footnote omitted). This includes things like "tangible objects related to the offense." *United States v. Neverson*, 463 F.2d 1224, 1230 n. 7 (D.C.Cir.1972). A surveillance photo from January 6 depicting Mr. Clark holding a 2x4 obviously fits this bill. This, combined with the amplifying effects of the small size of the array and the absence of double-blind procedures, renders the photo array highly—and impermissibly—suggestive.

### b. The identifications from the photographic array lack indicia of reliability.

Since the photo array is unduly suggestive, the government must demonstrate that the identification "possesses sufficient aspects of reliability" to prevent its exclusion. *Manson*, 432 U.S. at 106. Factors courts consider in evaluating the reliability of an identification procedure include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* at 114. Mr. Clark respectfully submits that a number of these factors—including opportunity to view, degree of attention, and passage of time—warrant the conclusion that any identification testimony is unreliable.

Officer Sikurinec here had a poor opportunity to view the assailant given distance between him and the person who tossed the 2x4, the pulsating crowd, and the people around him blocking his view.  Also important is the exposure duration, or the length of time the victim had to observe the assailant.  Based on the video footage and the officer's description of the event, the interaction where the plank was thrown appears to have lasted no more than a couple of seconds.

The "weapon focus" phenomenon also weakens the reliability of the identification.  Both courts and a robust body of social science research have demonstrated that when a weapon is present, victims' abilities to make accurate identifications are greatly reduced.  "[V]ictims, out of fear, often focus their attention on the perpetrator's weapon, rather than his face." *United States v. Stevens*, 935 F.2d 1380, 1392 (3d Cir. 1991).  *See also United States v. Singleton*, 702 F.2d 1159, 1179 (D.C. Cir. 1983) (Skelly Wright, J., concurring in part and dissenting in part) (discussing due process problems with witness identification not reached by majority, including the weapon focus phenomenon); *Young v. Conway*, 698 F.3d 69, 81 (2d Cir. 2012) (explaining that "it is human nature for a person toward whom a [weapon] is being pointed to focus h[er] attention more on the [weapon] than on the face of the person pointing it.") (internal quotation marks and citation omitted).  Here, the assailant used both a plank as a weapon.  And indeed, other people in the surveillance video from January 6 can be seen carrying many other weapons, including items like wooden planks, flag poles and stun guns.  It is likely that Officer Sikurinec focused on those objects or another plank, instead of his assailant's face.

The lengthy passage of time between the assault and the identification—approximately eight months—further diminishes the reliability.  No court has issued a strict timetable of how much time must pass between the incident and the identification before reliability begins to be diminished, but the Supreme Court has recognized that at least a period of several months is a

6

negative factor. *See*, *e.g.*, *Neil v. Biggers*, 409 U.S. 188, 201 (1972) ("There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases."). When courts have upheld identifications with lengthy intervals, it is in spite of the protracted identification and because of the strength of other *Manson* factors. *See, e.g.*, *United States v. Williams*, 596 F.2d 44, 49 (2d Cir. 1979) (holding that "although the time lapse of two years and eight months between the crime and the in-court confrontation is a somewhat negative factor," this was ultimately "outweighed by the other four Manson criteria, especially in view of [the witness's] spontaneous identification of appellant"); and *United States v. Larkin*, 978 F.2d 964, 970 (7th Cir. 1992) (recognizing that "[a]lthough the lineup followed the two bank robberies by 10 and 26 months, respectively, other indicia of reliability overcome the lapse in time as well as the alleged defects in the lineup procedures"). Here, the lengthy passage of time seriously weakens the reliability of the identifications, and the other four *Manson* factors do little to save the identification.

An analysis of the reliability factors makes plain that the identifications were unreliable. As a result, all testimony about out-of-court and any in-court identifications of Mr. Clark related to the assault on Officer Sikurinec should be suppressed. Where, as here, out-of-court identifications are unduly suggestive and not reliable, the Government should not be permitted to elicit in-court identifications.

## **Conclusion**

For the foregoing reasons, and for other such reasons as this Court may determine at a hearing on this motion, Mr. Clark respectfully requests that this motion be granted and that the Court suppress the use of the above-described identification testimony in his trial.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
COURTNEY MILLIAN
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500